1
2
3
4
5
6
7
8
9

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

TALITHA BROUGHTON,

Plaintiff,

v.

ANDREW SAUL, Acting Commissioner of
Social Security,[1]

Defendant.

Case No. 2:18-cv-02188-JAD-EJY

**REPORT AND RECOMMENDATION**

Re:  Motion for Reversal and/or Remand
(ECF No. 14)

10   Plaintiff Talitha Broughton ("Plaintiff") seeks judicial review of the final decision of the

11 Commissioner of the Social Security Administration ("Commissioner" or the "Agency") denying

12 her application for disability insurance ("DIB") under Title II of the Social Security Act.  For the

13 reasons stated below, the Court recommends that the Commissioner's decision be affirmed.

14                                    **I.      BACKGROUND**

15   On October 14, 2014, Plaintiff filed an application for DIB alleging an onset of disability on

16 April 25, 2014.  Administrative Record ("AR") 188–89.  The Commissioner denied Plaintiff's

17 claims by initial determination on March 2, 2015, and again upon reconsideration on December 28,

18 2015.  AR 105–09, 116–21.  On February 26, 2016, Plaintiff requested a hearing before an

19 Administrative Law Judge ("ALJ").  AR 122–23.  After conducting a hearing on June 13, 2017 (AR

20 34–67), ALJ Daniel G. Heely issued his determination on November 8, 2017, stating Plaintiff was

21 not disabled.  AR 13–28.  On December 20, 2017, Plaintiff requested that the Appeals Council

22 review the decision by the ALJ.  AR 177–82.  When the Appeals Council denied Plaintiff's request

23 for review on September 13, 2018, the ALJ's decision became the final order of the Commissioner.

24 AR 1–6.  This civil action followed.

25
26
27
28

[1]     Andrew Saul is the current Commissioner of Social Security and is automatically substituted as a party pursuant
to Fed. R. Civ. P. 25(d).  *See also* 42 U.S.C. § 405(g) ("Any action instituted in accordance with this subsection shall
survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any
vacancy in such office.").

## II.    STANDARD OF REVIEW

The reviewing court shall affirm the Commissioner's decision if the decision is based on correct legal standards and the legal findings are supported by substantial evidence in the record. 42 U.S.C. § 405(g); *Batson v. Comm'r Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal citation and quotation marks omitted). In reviewing the Commissioner's alleged errors, the Court must weigh "both the evidence that supports and detracts from the [Commissioner's] conclusion." *Martinez v. Heckler*, 807 F.2d 771, 772 (9th Cir. 1986) (internal citations omitted).

"When the evidence before the ALJ is subject to more than one rational interpretation, we must defer to the ALJ's conclusion." *Batson*, 359 F.3d at 1198, *citing Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995). A reviewing court, however, "cannot affirm the decision of an agency on a ground that the agency did not invoke in making its decision." *Stout v. Comm'r Soc. Sec. Admin.*, 454 F.3d 1050, 1054 (9th Cir. 2006) (internal citation omitted). Finally, the court may not reverse an ALJ's decision on account of an error that is harmless. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005) (internal citation omitted). "[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009).

## III.    DISCUSSION

### A.    Establishing Disability Under The Act

To establish whether a claimant is disabled under the Act, there must be substantial evidence that:

> (a)    the claimant suffers from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months; and

> (b)    the impairment renders the claimant incapable of performing the work that the claimant previously performed and incapable of performing any other substantial gainful employment that exists in the national economy.

*Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999), *citing* 42 U.S.C. § 423(d)(2)(A).  "If a claimant meets both requirements, he or she is disabled."  *Id*.

The ALJ employs a five-step sequential evaluation process to determine whether a claimant is disabled within the meaning of the Act.  *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); 20 C.F.R. § 404.1520(a).  Each step is potentially dispositive and "if a claimant is found to be 'disabled' or 'not-disabled' at any step in the sequence, there is no need to consider subsequent steps."  *Tackett*, 180 F.3d at 1098 (internal citation omitted); 20 C.F.R. § 404.1520.  The claimant carries the burden of proof at steps one through four, and the Commissioner carries the burden of proof at step five.  *Tackett*, 180 F.3d at 1098.

The five steps are:

Step 1.  Is the claimant presently working in a substantially gainful activity?  If so, then the claimant is "not disabled" within the meaning of the Social Security Act and is not entitled to disability insurance benefits.  If the claimant is not working in a substantially gainful activity, then the claimant's case cannot be resolved at step one and the evaluation proceeds to step two.  *See* 20 C.F.R. § 404.1520(b).

Step 2.  Is the claimant's impairment severe?  If not, then the claimant is "not disabled" and is not entitled to disability insurance benefits.  If the claimant's impairment is severe, then the claimant's case cannot be resolved at step two and the evaluation proceeds to step three.  *See* 20 C.F.R. § 404.1520(c).

Step 3.  Does the impairment "meet or equal" one of a list of specific impairments described in the regulations?  If so, the claimant is "disabled" and therefore entitled to disability insurance benefits.  If the claimant's impairment neither meets nor equals one of the impairments listed in the regulations, then the claimant's case cannot be resolved at step three and the evaluation proceeds to step four.  *See* 20 C.F.R. § 404.1520(d).

Step 4.  Is the claimant able to do any work that he or she has done in the past?  If so, then the claimant is "not disabled" and is not entitled to disability insurance benefits.  If the claimant cannot do any work he or she did in the past, then the claimant's case cannot be resolved at step four and the evaluation proceeds to the fifth and final step.  *See* 20 C.F.R. § 404.1520(e).

Step 5.  Is the claimant able to do any other work?  If not, then the claimant is "disabled" and therefore entitled to disability insurance benefits.  *See* 20 C.F.R. § 404.1520(f)(1).  If the claimant is able to do other work, then the Commissioner must establish that there are a significant number of jobs in the national economy that claimant can do.  There are two ways for the Commissioner to meet the burden of showing that there is other work in "significant numbers" in the national economy that claimant can do: (1) by the testimony of a vocational expert [("VE")], or (2) by reference to the Medical-Vocational Guidelines at 20 C.F.R. pt. 404, subpt. P, app. 2.  If the Commissioner meets this burden, the claimant is "not disabled" and therefore not entitled to disability insurance benefits.  *See* 20 C.F.R.

§§ 404.1520(f), 404.1562. If the Commissioner cannot meet this burden, then the claimant is "disabled" and therefore entitled to disability benefits. *See id.*

*Id.* at 1098–99 (internal alterations omitted).

**B.    Summary of ALJ's Findings**

At step one, the ALJ determined that Plaintiff did not engage in substantial gainful activity since April 25, 2014, the alleged onset date of disability.[2] AR 18. At step two, the ALJ found that Plaintiff suffered from medically determinable severe impairments consisting of "osteoarthritis of the left shoulder and degenerative disc disease."[3] AR 19. At step three, the ALJ found that Plaintiff's impairment or combination of impairments did not meet or equal any listed impairment in 20 C.F.R., Part 404, Subpart ("Subpt.") P, Appendix ("App.") 1. AR 21.

In preparation for step four, the ALJ found that Plaintiff had the residual functional capacity ("RFC")[4] to:

> [P]erform light work as defined in 20 CFR 404.1567(b), consisting of lifting or carrying no more than twenty pounds with frequent lifting or carrying of objects weighing up to ten pounds. The claimant is able to sit for six hours in an eight-hour workday and stand or walk for six hours in an eight-hour workday. The claimant is limited to only occasional overhead reaching ith the bilateral upper extremities. She also is limited to only occasional balancing, stooping, kneeling, crouching, crawling, and claiming [sic] ramps and stairs, but can never climb ladders, ropes, or scaffolds. The claimant also can never work around hazards, such as moving dangerous machinery or unprotected heights.

*Id.*

At step four, the ALJ determined after reviewing the "testimony of the vocational expert and . . . the record" that "[t]he claimant is capable of performing past relevant work as a companion.

---

[2]    The ALJ noted that Plaintiff has performed "home support services type work since 2015," but did not deny claimant's application at the first step of the sequential evaluation process because "this was part time work and right at, or slightly below, the substantial gainful activity threshold of $1,130 per month per her earnings reports[.]" AR 19.

[3]    Although not pertinent to the discussion herein, the ALJ appropriately found that Plaintiff's impairments of "obesity, chronic obstructive pulmonary disease, and carpal tunnel syndrome on the left [side]" were not severe impairments. AR 19. The ALJ also properly considered the four broad areas of mental functioning set out in the disability regulations for evaluating mental disorders and in the Listing of Impairments before finding "[t]he claimant's medically determinable mental impairments of anxiety and depression, considered singly and in combination, do not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and are therefore nonsevere." *Id.*

[4]    "Residual functional capacity" is defined as "the most you can still do despite your limitations." 20 C.F.R. § 416.945(a)(1).

This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565)."[5]  AR 25, 27.

The ALJ made alternative findings at step five of the sequential evaluation process, explaining that "[a]lthough the claimant is capable of performing past relevant work, there are other jobs existing in the national economy that she is also able to perform," including the "[l]ight" exertional level and SVP skill level 2 occupations of "[t]icket [t]aker," Dictionary of Occupational Titles, or "DOT," number 344.667-010; "[i]nformation [c]lerk," DOT number 237.368-018; and, "[p]arking [l]ot [b]ooth [a]ttendant," DOT number 915.473-010.[6]  AR 27–28.

The ALJ concluded that "the claimant has not been under a disability, as defined in the Social Security Act, from April 25, 2014, through the date of this decision (20 CFR 404.1520(f))."  AR 28.

**C.**     **Summary of Medical Evidence**[7]

   **1.**     **Dr. Natalia Balytsky's Examinations**

On April 25, 2014, Plaintiff's treating physician, Dr. Natalia Balytsky, a pain management specialist and anesthesiologist, completed an Initial Evaluation Report following Plaintiff's treatment for a work place injury.[8]  AR 680–87.  Dr. Balytsky noted that:

> during the course of [Plaintiff's] employment as a healthcare provider for Home Support Services, she sustained injuries to her neck, upper back, lower back, left shoulder, left arm, left elbow, left hand and left leg.  She states that while she was at work doing laundry, a maintenance man came with a machine.  When he moved the machine, water spilled causing her to slip and fall on the floor.  She reported the injury to her employer but she was not sent for treatment at that time.  She continued working.
>
> The patient then went to see a doctor on her own.  X-rays and MRI scan[s] were performed on February 11, 2011.  She was seen by a pain management doctor.  She received physical therapy at Kaiser and had TENS, both of which did not provide her relief.  She also received chiropractic care.

---

[5]     The Court notes that Page 10 of the ALJ's decision (AR 26) inexplicably follows Page 11 of the ALJ's decision (AR 25) in the Administrative Record.

[6]     The ALJ's decision references the parking lot booth attendant position as DOT number "515.473-010," which appears to be a clerical error.  AR 28.  The correct DOT number is listed here.

[7]     The Court does not discuss the state medical consultants' opinions (AR 68–85, 87–103, 408–15), because they are not at issue between the parties.

[8]     Dr. Balytsky's Initial Evaluation Report is provided twice in the Administrative Record.  *Compare* AR 680–87 *with* AR 730–37.  The Court declines to cite to the alternative paginations, as doing so would be superfluous.

AR 681–82.  At this Evaluation, Plaintiff:

> rate[d] the severity of [her] pain as 10 [out of 10].  Her average level of pain in the last seven days is 10.  She describes the pain as sharp, throbbing, dull, aching, pressure like, cramping, shooting and burning with muscle pain and needles sensation.  The pain is aggravated by bending forward, bending backwards, reaching, kneeling, coughing or straining, lying down, relaxing, pushing shopping cart[s] and leaning forward and prolonged standing, sitting and walking.  The pain is relieved with medication, application of heat and ice and elevating the affected area.

> The patient states that her symptoms have been worsening since the injury.  The pain in her neck is 80% of her pain, and the pain in her arm is 80% of her pain.  The pain in her back is 80% of her pain, and the pain in her leg is 80% of her pain.

> With regard to functional limitations during the past month, the patient avoids going to work, socializing with friends, performing household chores, participating in recreation, driving, doing yard-work or shopping, having sexual relations, and caring for herself because of her pain.

> The patient reports no bowel or bladder problems.

AR 682.  Plaintiff reported "work[ing] for Home Support Services as a healthcare provider since July 2005[,] . . . working part time under light duty with restrictions of no bending, stooping, squatting or twisting, no pushing or pulling, no prolonged standing, walking or sitting and no lifting more than two pounds."  AR 683.  Plaintiff remarked that "her employment status has been affected by her present pain condition."  *Id.*

On physical examination of Plaintiff, Dr. Balytsky made the following observations:

- "The patient is a well-developed, well-nourished female, who appears in pain, outwardly depressed and tearful.  She is alert and oriented x4 with appropriate mood and pleasant affect with no somnolence.  She is well-dressed, well-groomed and a good historian.  She ambulates without an assistive device with an antalgic gait pattern.  She is unable to don and doff her shoes independently" (AR 684);

- Plaintiff's musculoskeletal examination revealed that:
    - her cervical spine has "range of motion to forward flexion is 35 degrees, extension is 40 degrees, rotation is 60 degrees, and side bending is 65 degrees to the right and 65 degrees to the left," "normal alignment without asymmetry or kyphosis," "tenderness to palpation over the left cervical paraspinal muscles and superior trapezius," "no spinous process tenderness or masses palpable along the cervical spine, " and "negative Spurling's maneuver" (*id.*);
    - her left shoulder has "range of motion to forward flexion is 140 degrees, abduction is 140 degrees, external rotation is 70 degrees, internal rotation is 70 degrees, and extension is 35 degrees," "tenderness to palpation over the lateral and posterior aspects of the shoulder," "positive Hawkin's test, positive Drop arm test with weakness[,] and positive crossed arm adduction test" (*id.*); and,

- o her lumbar spine has "range of motion to forward flexion is 40 degrees and extension is 10 degrees. Rotation and side bending are limited," "no asymmetry or scoliosis," "normal alignment with normal lumbar lordosis," "tenderness to palpation over the bilateral lumbar paraspinal muscles consistent with spasms," "left sciatic notch tenderness and piriformis spasm," "increased pain with piriformis stretching," "no spinous process tenderness or masses palpable along the lumbar spine," "positive lumbar facet loading maneuver bilaterally," and positive straight leg raise test on the left in the seated and supine position to 40 degrees." (AR 684–85).

- Plaintiff had "normal bulk and tone in all major muscle groups of the upper and lower extremities. Motor strength is 5/5 and symmetric throughout the bilateral upper and lower extremities, except 2/5 on left shoulder flexion/abduction and 4/5 on left grip strength" (AR 685);

- Plaintiff's sensory examination revealed that she was "[g]rossly intact to light touch and pinprick throughout the upper extremities. There is diminished sensation in the left L5 and S1 dermatomes of the lower extremities" (*id.*); and,

- Plaintiff's deep tendon reflexes were "[n]ormal. Reflexes are symmetric at 2+/4 in the bilateral upper extremities and 2+/4 in the bilateral lower extremities." (*id.*).

Dr. Balytsky diagnosed Plaintiff with "[l]eft shoulder pain," "[l]ow back pain," "[l]umbar radiculitis," "[n]eck pain," and "[m]yofascial pain." AR 685. Dr. Balytsky requested: "continued conservative management for complaints of low back and neck with radicular pain and left shoulder pain," a MRI scan of Plaintiff's "left shoulder," authorization for "[h]ydrocodone" and "[m]ethyl salicylate," "physical therapy to the left shoulder, neck and back," and "the names and contact information of three . . . pain management specialists within 30 miles to transfer care into the medical provider network" as necessary. AR 685–86. Dr. Balytsky placed Plaintiff "on modified duty with restrictions of no lifting or carrying over 10 pounds, no pushing or pulling over 10 pounds, no repetitive bending or kneeling, limited use of the upper extremity, no reaching, and no overhead activities." AR 686–87.

From May 29, 2014 through November 3, 2015, either Dr. Balytsky (AR 654, 658–59, 662–63, 665, 669, 672–73, 675), her co-physician Dr. Gary Martinovsky (AR 651), her nurse practitioner (AR 615, 618, 623, 625, 629, 632, 635, 638, 642, 650), or her physician's assistant (AR 646, 679) assessed "restrictions of no lifting or carrying over 10 pounds, no pushing or pulling over 10 pounds, no repetitive bending or kneeling, limited use of the upper extremity, no reaching, and no overhead

7

activities."[9]  Each of these treatment notes also documented left shoulder "tenderness" and left shoulder "forward flexion [a]s 140 degrees, external rotation [a]s 70 degrees, internal rotation [a]s 70 degrees, and extension [a]s 35 degrees."  AR 615, 617, 622, 624–25, 628, 631, 634, 637, 641, 649, 654, 658, 662, 665, 669, 672, 675, 678.  In addition, from May 29, 2014 through August 26, 2015, either Dr. Balytsky (AR 662, 665, 669, 672, 675), her nurse practitioner (AR 622, 628, 631, 634, 637, 641, 649, 654), or her physician's assistant (AR 678) opined that Plaintiff had "normal bulk and tone in all major muscle groups of the upper and lower extremities" and rated her motor strength at five out of five and symmetric throughout the bilateral upper and lower extremities, two out of five in the left shoulder, and four out of five with the left grip.  The only exception to these consistent treatment notes was on March 2, 2015, when a physician's assistant reported Plaintiff's left shoulder abduction as "130 degrees" and her motor strength at "4-/5."  AR 645.

### 2.     Dr. David Fisher's Examinations

On August 15, 2014, Dr. David Fisher, an orthopedist, performed Plaintiff's Orthopedic Panel Qualified Medical Re-evaluation.[10]  AR 360–68.  Dr. Fisher noted that Plaintiff suffered two work injuries:

> The first injury occurred on February 9, 2009 and involved a slip and fall.  She fell on her left side, grabbing on with her left arm.  She slipped in some liquid that had been spilled by a maintenance worker behind her.  This resulted in injury to her left shoulder and low back as well as her neck from the fall on her left side.  She also had pain in her left buttock and in her left arm.  She had a second injury on September 9, 2011 when she was lifting a box, which resulted in some additional pain in her left shoulder.  This second injury involved only her left shoulder.

AR 360–61.  Dr. Fisher previously ordered a "left shoulder MRI, and an EMG/nerve conduction study in September 2012, but none of these were performed.  AR 361.  Plaintiff stated she had "an

---

[9]     For claims filed before March 27, 2017, including the instant application for disability benefits, physician's assistants are not classified as "acceptable medical source[s]." 20 C.F.R. § 416.902(a)(8).  However, Dr. Balytsky or Dr. Martinovsky reviewed, approved, and electronically signed off on these treatment notes.  "As long as a report is signed by an 'acceptable medical source,' it becomes the opinion of that medical source whether or not such source actually wrote it; that is, the signature clearly demonstrates the signor's agreement with the content of the report." 2 Soc. Sec. Disab. Claims Prac. & Proc. § 22:51 (2nd ed.).

[10]     Dr. Fisher previously completed a Qualified Medical Evaluation on September 11, 2012, before Plaintiff's alleged onset date of disability.  AR 349–59.  Because evidence from outside the relevant period is of limited relevance, the Court declines to discuss this Evaluation.  *Carmickle v. Comm'r of Soc. Sec.*, 533 F.3d 1155, 1165 (9th Cir. 2008).

MRI of her neck, but this is not available.  She was told this showed multiple disk herniations and bulges.  She is under no active treatment." *Id*.

At this visit, Plaintiff "complain[ed] of pain, in order of severity, in (1) her left shoulder, (2) the left side of her neck, (3) her left arm, and (4) her left hip."  AR 361.  Plaintiff claimed her "activities of daily living have been affected in dressing and grooming with pain.  She has some difficulty walking and climbing stairs because of her left hip pain and she states her hip catches.  She requires help with doing housework and laundry, driving, shopping, and cooking."  *Id*.

On physical examination, Plaintiff "had full range of motion of her cervical spine, though she had some pain at the extremes of rotation.  She stated that extension caused her discomfort as well"; "[r]ange of motion of her shoulders was limited on the left side"; "positive median nerve compression test on the left, negative on the right"; "positive Phalen's test on the left, negative on the right"; "negative" Finkelstein's test; and, "negative bilateral[]" Tinel's test.  AR 362–63.  Plaintiff's range of motion in degrees in "[f]lexion" and "[a]bduction" was "170" degrees on her right side, and "120" degrees on her left side.  AR 362.  Dr. Fisher administered a Jamar Dynamometer grip strength test three times, and Plaintiff was able to grip 10kg with both hands in Trial 1, 8kg with both hands in Trial 2, and 8kg with her right hand and 6kg with her left hand in Trial 3.  *Id*.  Dr. Fisher noted Plaintiff had "tenderness in the anterior aspect of the left shoulder and the trapezius on the left side and in the lateral aspect of the left shoulder in the area of the subacromial bursa."  AR 363.  Plaintiff "ambulated about the room freely in toe, heel, and neutral gait, although she had some tenderness in the greater trochanteric bursa and, to a lesser degree, in the left SI joint.  She was able to mount and dismount the examination table."  *Id*.

Dr. Fisher diagnosed Plaintiff with "[c]ervical strain with radiculopathy, rule out disk herniation," "[i]mpingement syndrome, left shoulder, rule out internal derangement," "[e]arly carpal tunnel syndrome on the left," "[t]rochanteric bursitis of the left hip," and "[l]eft SI joint dysfunction." *Id*.  Dr. Fisher noted that Plaintiff "is not yet maximally medically improved and is in need of treatment."  *Id*.  Dr. Fisher opined, "within reasonable medical probability," that "60%" of Plaintiff's left shoulder pain resulted from "her original injury she suffered on February 9, 2009, which resulted in a pulling and jerking injury when she fell, and 40% would be [due] to the aggravation caused by

9

the lifting injury [on] September 9, 2011."  AR 364.  "As for [Plaintiff's] cervical spine and left carpal tunnel syndrome, causation appears to be the February 9, 2009 injury."  *Id*.  Dr. Fisher concluded that Plaintiff "could continue to work at modified duty status, but should do no lifting or reaching above shoulder height with her left arm."  *Id*.  Dr. Fisher expressed a desire to "review the MRI films [and x-rays] of [Plaintiff's] cervical spine," mentioned that Plaintiff "may be a candidate in the future for carpal tunnel release as well as injections to her left shoulder and left greater trochanteric bursa and left SI joint," and recommended that Plaintiff "reduce her medication to anti-inflammatory medication only at this time."  *Id*.

On March 12, 2015, Dr. Fisher performed another Orthopedic Panel Qualified Medical Re-evaluation.[11]  AR 416–28.  By this time, Plaintiff:

> had an MRI of her cervical spine and was told that she had a disk bulge in her cervical spine, but the films [were] not available.  She also had an MRI of her left shoulder [on May 15, 2014, at Dr. Balytsky's behest].  The report indicates that there was no evidence of a rotator cuff tear.  It was recommended that she have an EMG and nerve conduction study of both upper extremities.  This was not done.  She never had any x-rays, except at Kaiser for her cervical spine, but these have not been made available.  [Dr. Fisher] suggested that she have injections to her left shoulder with possible manipulation under anesthesia.  However, this was not done.  She has regained some motion.  She says she has joined a gym and is exercising in a gym.

AR 417.  At this visit, Plaintiff complained of, "in order of severity, . . . (1) her neck, (2) her left elbow, [(]3) numbness in her left hand, (4) pain in her lower back, and (5) pain in her left shoulder."  *Id*.  Plaintiff "describe[d] stiffness in her arm, neck, shoulders, and hands with numbness in those areas, tingling in both of those areas along with giving way.  Her lower back appear[ed] to have improved."  *Id*.  Dr. Fisher noted that Plaintiff worked "for ten years as a caregiver.  She is constantly lifting up to waist height, mopping, cooking, doing laundry, bathing, and grocery shopping for her clients."  AR 418.  Plaintiff "requires assistance with bathing, dressing, grooming, doing housework, doing laundry, driving, shopping, as well as cooking.  She is independent in all other activities of daily living."  *Id*.

---

[11]     The Court does not discuss the Worker's Compensation rating Dr. Fisher gave to Plaintiff at this re-evaluation, because it is not at issue between the parties.  *See* AR 420–21.  Further, as the ALJ notes, "Worker's Compensation proceedings are determined on a different set of standards than disability decisions."  AR 26.

Plaintiff's physical examination revealed that "[s]he had full range of motion of her cervical spine," "no muscle spasm in her neck," "tenderness in the anterior aspect of her shoulder in the area of the biceps tendon, more on the left than the right," "some tenderness in the lateral aspect, in the area of the subacromial bursa," "no pain in the trapezius muscles," and "tenderness in both lateral epicondyles, right more so than the left." AR 419. Dr. Fisher documented Plaintiff's left shoulder flexion as "150" degrees, and bilateral shoulder abduction as "170" degrees. *Id*. Dr. Fisher noted that Plaintiff "gave very little effort" on her physical examination, but "clinically appeared to be significantly stronger." AR 418. With respect to motor function, Plaintiff scored a five out of five "in the biceps, triceps, wrist flexors and extensors and intrinsics of the hand. There were no sensory deficits in the upper extremities, but she did have a positive median nerve compression test on the left side; negative on the right." AR 419. Plaintiff also scored a five out of five "in the quadriceps, hamstrings, anterior tibialis, posterior tibialis, extensor hallucis longus and peroneals. There were no sensory deficits in the lower extremities and deep tendon reflexes were brisk and symmetrical." AR 420. Plaintiff was "able to ambulate about the room freely in toe, heel, and neutral gait." AR 419. Dr. Fisher observed "some tenderness in the center of [Plaintiff's] lower back, but she had a negative straight leg raise." *Id*.

Dr. Fisher diagnosed Plaintiff with "[l]umbosacral strain, resolved"; "[c]ervical strain with non-verifiable radiculopathy based on her history"; "[s]ubacromial bursitis and bicipital tendinitis of the left shoulder"; "[c]arpal tunnel syndrome in the left hand"; and, "[b]ilateral lateral epicondylitis, nonindustrial." AR 420. Dr. Fisher noted that Plaintiff "is now maximally medically improved." *Id*. Dr. Fisher opined that "[c]ausation of [Plaintiff's] neck and shoulder and low back symptoms appears to be the injury of February 5, 2009 with the injury of February 12, 2012 partially involving her shoulder." AR 421. Dr. Fisher concluded that Plaintiff "should do no lifting above shoulder level with her left arm and no lifting more than 25 pounds. [Dr Fisher had] no specific work restriction recommendations for her cervical spine or lumbar spine." AR 422. Dr. Fisher believed reviewing MRI and x-ray films of Plaintiff's cervical spine, MRA films of Plaintiff's left shoulder, and a "nerve conduction study of both upper extremities" would be "important in determining the future need for treatment and the level of impairment." *Id*. Dr. Fisher opined that

"injections of cortisone to both elbows to relieve [Plaintiff's] lateral epicondylitis, along with the use of tennis elbow straps and stretching exercises," would be beneficial.  *Id*.

On June 6, 2015, Dr. Fisher submitted a Supplemental Orthopedic Panel Qualified Medical Evaluation Report to California's Workers' Compensation Appeals Board.  AR 789.  Dr. Fisher stated that he had received an April 24, 2015 EMG with nerve conduction study of Plaintiff's bilateral upper extremities, which was "normal . . . without any evidence of peripheral neuropathy and no evidence of cervical radiculopathy."  *Id*.  Dr. Fisher also consulted x-rays of Plaintiff's cervical spine, which:

> show some anterior spurring at C5-6 and straightening of the normal cervical lordotic curve without any evidence of significant disc space narrowing.  There is otherwise no evidence of fracture or dislocation seen with the only degenerative changes seen at the C5-6 anteriorly.  There is no evidence of subluxation, fracture, or dislocation . . . .

*Id*.  Dr. Fisher again noted that he would like "to review the MRI of [Plaintiff's] cervical spine and the MRA of [Plaintiff's] left shoulder."  *Id*.

### 3.    MRIs of Plaintiff's Left Shoulder

On May 15, 2014, an MRI of Plaintiff's left shoulder taken at Valley MRI and Radiology Inc. revealed "[m]inimal early subcortical cystic degeneration of the humeral head at the infraspinatus insertion[, but n]o definite rotator cuff tear or tendinopathy."  AR 701.

On April 19, 2015, an MRI of Plaintiff's left shoulder taken at Mid Valley Imaging revealed: "[f]lat [and l]aterally downsloping . . . [a]cromion"; "[o]steoarthritis" in Plaintiff's "[a]cromioclavicular joint"; "[t]endinosis" in Plaintiff's "[s]upraspinatus" and "[i]nfraspinatus"; a "[t]ear" in Plaintiff's "[a]nterior labrum"; and, "[s]ubcortical cysts in the humeral head."  AR 693–94.

### D.    <u>Plaintiff's Symptom Testimony</u>

On examination by ALJ Daniel Heely during the June 13, 2017 administrative hearing, Plaintiff testified that she has worked at:  "In-Home Support Services since 2005" (AR 38); "Healthcare Services, El Camino Care Center" from October 20, 2015, through April 2017 (AR 40–41); "Windsor Care Facility" from July 2016 through March 2017 (AR 45–46); and, at "Briarwood" from April 2017 through the date of the hearing (AR 46).  Apart from claimant's job at Healthcare

Services, which consists of "doing laundry," the rest of Plaintiff's part-time jobs consist of "supportive care." AR 47. Plaintiff clarified that she did not have to lift "even 20" pounds at her Healthcare Services job; "[m]aybe five" pounds at her Windsor Care Facility job; and, "do[es]n't lift anything" at her Briarwood job. AR 48. When asked, Plaintiff stated that she cannot "work at any full-time job now, 40 hours a week[.]" AR 48–49.

Plaintiff testified that her most serious physical problem is that "[b]oth of [her feet] start swelling" when she "stand[s] for a long period of time." AR 49. Plaintiff believes that her physician told her that the swelling is caused by "circulation from the sciatic nerve damage . . . in [her] left [foot]." *Id.* Plaintiff explained that this injury resulted from a slip-and-fall at work. *Id.* Plaintiff filed a worker's compensation claim for this incident, which was "settled," although "[n]o medical coverage" was provided. *Id.* Plaintiff did not receive surgery because of the slip and fall or have surgery on any part of her body related to her ability to work, and her doctor has not recommended surgery. AR 50. "The only thing [Plaintiff's physicians] prescribed for [her circulation issues is] to put . . . inserts" in her shoes, which "helps." AR 51.

Other than her swelling and sciatica in her left leg, Plaintiff initially reported no other major physical issues. AR 50. However, Plaintiff later said she experiences "shooting pains [in both arms] that come from [her] shoulders . . . to [her] hands and in [both of her] elbows." AR 51–52. After performing radiological examinations, Plaintiff's physician said her shooting pains are a result of "a bulging disc in [her] neck." AR 51. Plaintiff "went to physical therapy, and [her physical therapists] were supposed to give [her] the cortisone shots, but they never gave them to [her]." AR 52. In addition, Plaintiff reported that her physical therapy did "[n]ot really" help. *Id.* Plaintiff uses an "Albuterol" inhaler for her "bronchitis," particularly during "[a]llergy season." *Id.* Plaintiff smokes about "a pack of cigarettes . . . [every] two days." AR 53.

Plaintiff confirmed that she takes "different prescription medication from [her] doctors for . . . physical issues . . . the way the doctors have told [her] to." *Id.* Plaintiff has never been diagnosed with breathing issues; does not drink alcohol, consume any illegal drugs or medical marijuana; is not on probation or parole; and, does not have any bad side effects from her prescribed medication. *Id.* Plaintiff initially started mental health treatment at Kaiser "around 2005 or 2006," although she

does not receive such treatment now.  AR 54.  Plaintiff was supposed to receive medication for her mental issues, but reported that she is only taking "Xanax" for her "anxiety attacks" and insomnia. AR 54–55.  Plaintiff denied ever receiving mental health counseling.  AR 55.

Plaintiff lives with her husband and her two sons, who are 25 and 21 years old.  AR 55–56. Her 21-year old son used to receive Supplemental Security Income ("SSI"), and her 25-year old son still receives SSI for his "learning disability," although Plaintiff is the payee for these benefits.  AR 56.  One of Plaintiff's sons passed away in 1992, and her sister and brother passed away in 2015. AR 54.  Plaintiff "tr[ies] to wash dishes . . . if there's a little bit of dishes in the sink."  AR 57. Plaintiff's family "[s]ometimes . . . help[s her]  get in the shower[ and] . . . put[s her] shirt on because of [her] arms. . . . [Her] husband do[es her] hair . . . [b]ecause sometimes [she] can't raise [her] . . . hands up."  AR 56, 61.  Plaintiff "do[es] a little laundry," "[m]icrowaving, maybe a little cooking on the stove," and "drive[s] . . . to the store or . . . to work and back home."  AR 57.  "Every once in a while," Plaintiff engages in "regular outside activities besides work[] . . . , including going to religious or cultural activities[,] going out to eat . . . [,] or visiting someone at their [sic] home."  *Id*. Plaintiff watches television and uses a cellphone.  *Id*.  Plaintiff denied taking "long trips more than 100 miles away from [her] home."  AR 58.

On examination by her attorney, Plaintiff testified that she gets anxiety attacks "maybe once a month" when she is "really upset."  AR 59.  Plaintiff does not get anxiety attacks "as often as [she] was getting them" when she was not working, which was about "twice a week."  AR 59.  Plaintiff reported feeling "[m]ore sad" for about "a[n] hour or so" when she has panic attacks.  AR 60. Plaintiff feels numbness in her leg because of her sciatica, which "[o]ften" interferes with her ability to move around.  *Id*.  Plaintiff reported having good days and bad days with her pain, including when she was not working.  AR 61.  Plaintiff confirmed that she "drops things" and has "problems . . . moving [her] fingers and grasping . . . objects."  *Id*.  Plaintiff experiences the "same" amount of pain in both arms.

On reexamination by ALJ Heely, Plaintiff testified that the "only health problem [bothering her that either her attorney or the ALJ hadn't asked her about relates to her] . . . women issues[.]" AR 62.  Plaintiff has not been prescribed any "special medication" to help with these issues.  *Id*.

**E.      Vocational Expert ("VE") Testimony**

VE Green testified at Plaintiff's administrative hearing that Plaintiff had past relevant work as a "home attendant[,] DOT [number] 354.377-014," physical demand at the "[m]edium" level, SVP skill level 3, and as a "companion[, DOT number] 309.677-010," physical demand at the "[l]ight" level, SVP skill level 3.  AR 63.

First, ALJ Heely asked VE Green to assume a hypothetical individual "essentially the same age as Ms. Broughton with a similar educational background and work history" who:

> could perform sedentary work as that is defined in the regulations . . . , except [the hypothetical person] would be limited to lifting or carrying five pounds occasionally, sitting four hours, standing and/or walking up to a maximum of one hour each; could never climb, balance, stoop, kneel, crouch, or crawl; could never work around hazards such as moving, dangerous machinery or unprotected heights; and would need unscheduled rest breaks in additional to regular breaks, causing the employee to be away from the workstation and off task 20% of the workday.

AR 64.  VE Green testified that "there would be no work for that hypothetical individual."  *Id.*

ALJ Heely then asked VE Green to assume another hypothetical individual "essentially the same age as Ms. Broughton with a similar educational background and work history who:

> could perform light work as that is defined in [the Social Security] regulations, except [the hypothetical person] could reach overhead occasionally with the bilateral upper extremities; could never climb ladders, ropes, or scaffolds; could occasionally climb ramps or stairs; could occasionally balance, stoop, kneel, crouch, or crawl, but could never work around hazards like moving, dangerous machinery or unprotected heights.

*Id.*  VE Green testified that Plaintiff's past relevant "companion job would still be available" for this hypothetical individual.  AR 65.  VE Green further stated that this hypothetical individual could work other jobs in the economy all with physical demand at the "[l]ight" level and SVP skill level 2, including "[t]icket taker[, DOT number] 344.667-010," with "61,000 [jobs] in the nation"; "[i]nformation clerk[, DOT number] 237.367-018," with "35,000 [jobs] in the nation"; and, "parking lot booth attendant," with "45,000 [jobs] in the nation."  *Id.*

**F.    Issue Presented**

Plaintiff contends the ALJ erred by failing to articulate specific and legitimate reasons for according "limited weight" to Plaintiff's examining physician's opinion.[12]  ECF No. 14 at 8:12–17:17.

### 1.    Plaintiff's Treating Physician's Opinion

In accordance with Social Security regulations, courts have "developed standards that guide our analysis of an ALJ's weighing of medical evidence."  *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1998 (9th Cir. 2008) (internal citation omitted).  Courts "distinguish among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)."  *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).  For claims filed before March 27, 2017, as is the case here, "the opinion of a treating physician is [given] greater weight than that of an examining physician, [and] the opinion of an examining physician is entitled to greater weight than that of a nonexamining physician."  *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014) (internal citation omitted); *see also* 20 C.F.R. §§ 404.1527, 416.92.

"If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence."[13]  *Garrison*, 759 F.3d at 1012 (internal citation omitted).  "This is so because, even when contradicted, a treating or examining physician's opinion is still owed deference and will often be 'entitled to the greatest weight . . . even if it does not meet the test for controlling weight.'"  *Id.*, *citing Orn v. Astrue*, 495 F.3d 625, 633 (9th Cir. 2007).  To satisfy the "substantial evidence"

---

[12]     The ALJ also found Plaintiff's "allegations are not fully consistent with the objective medical evidence and the other evidence of record."  AR 25.  Plaintiff does not contest the ALJ's adverse credibility determination, and therefore, this issue is deemed waived.  *Carmickle v. Comm'r of Soc. Sec.*, 533 F.3d 1155, 1161 n.2 (9th Cir. 2008) (determining court may decline to address on the merits issues not argued with specificity); *Kim v. Kang*, 154 F.3d 996, 1000 (9th Cir. 1998) (a court may not consider on appeal issues not "specifically and distinctly argued" in the party's opening brief).

[13]     Defendant maintains that "an ALJ must give *good reasons* that are supported by substantial evidence" in order to reject a contradicted treating physician's opinion.  ECF No. 17 at 3:16 (emphasis added) (internal footnote omitted).  To the contrary, the Ninth Circuit has employed the specific and legitimate reasons standard when reviewing an ALJ's decision to reject a treating physician's contradictory opinion.  *Garrison*, 759 F.3d at 1012 (internal citation omitted).  This Court is bound to follow Ninth Circuit precedent.

requirement of the specific and legitimate reasons standard, the ALJ should set forth a "detailed and thorough summary of the facts and conflicting clinical evidence, stat[e] his interpretation thereof, and mak[e] findings." *Garrison*, 759 F.3d at 1012, *citing Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998). "The ALJ must do more than state conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct." *Id*. (internal citation and quotation marks omitted). The ALJ can never arbitrarily substitute his own opinion for the opinion of competent medical professionals. *Tackett*, 180 F.3d at 1102–03.

Here, the ALJ attributed "limited weight" to the opinion of Plaintiff's treating physician, Dr. Natalia Balytsky, because:

> the severity of those limitations [Dr. Balytsky assessed is] not supported by the claimant's clinical findings from other treatment providers showing that the claimant was neurological[ly] intact without clinical findings of diminished strength. While there is some pain or tenderness on range of motion testing, this would not completely eliminate the claimant's ability to reach[,] and the ten pounds weight restriction is excessive in light of the claimant's longitudinal treatment history. The [ALJ] note[d] that the same restrictions were given at every one of the claimant's appointments from April 25, 2014 to August 26, 2015. However, these work restrictions did not improve with claimant's clinical findings of other treatment providers. When the claimant was evaluated by Dr. Balytsky in April 2014, her motor strength was rated at two out of five in the left shoulder and four out of five with the left grip . . . . However, these neurologic findings were not found by any other treating or examining source and they were repeated verbatim by Dr. Balytsky in examination reports on at least 14 other dates . . . .

AR 23–24. In lieu of Dr. Balytsky's opinion, the ALJ decided to afford "great weight" to Dr. Fisher's opinion, because it:

> is supported by . . . Dr. Fischer's [sic] examinations showing left shoulder deficits, but no impairment to the claimant's ability to stand or walk. Further, Dr. Fischer [sic] specifically noted that the claimant was not at maximal medical improvement and this was only four months after the claimant's alleged onset date. The [ALJ] also note[d] that Dr. Fischer [sic] is an orthopedist. As such, his specialty is more closely related to [the] claimant's diagnosed impairments than that of Dr. Balytsky.

AR 24, *citing* AR 360–68. The ALJ's findings are discussed below.

        a.    <u>Defendant waived any challenge it may have had to Plaintiff's contention that the ALJ's lay opinion respecting her pain and tenderness on range of motion and their impact on her ability to reach was improper.</u>

"An ALJ's decision to ignore medical evidence and substitute his or her own views for such an opinion is erroneous.[] As a lay person, the ALJ simply is not qualified to interpret raw medical

17

data in functional terms.[] A case record must provide some support for the specific limitations found by an ALJ.  If an ALJ rejects all record opinions indicating limitations, the 'evidentiary deficit' that leaves cannot be filled by the ALJ based on his or her lay opinion of RFC.[]"  3 Soc. Sec. Disab. Claims Prac. & Proc. § 25:62 (2nd ed.) (internal footnotes omitted).  The ALJ accorded Dr. Balytsky's opinion little weight in part because "some pain or tenderness on range of motion testing . . . would not completely eliminate [Plaintiff's] ability to reach."  AR 23.  Plaintiff argues that "the ALJ's lay medical opinion does not qualify as a legitimate reason to dismiss the opinion of Dr. Balytsky."  ECF No. 14 at 11:7–10, *citing Tackett*, 180 F.3d at 1102–03.

As a preliminary matter, Defendant presents no argument in opposition to Plaintiff's contention.  As it is not this Court's role to distill potential arguments that could be made based on the record, for this reason, if no other, the Court is justified to find that the ALJ erred in evaluating this opinion and Defendant has waived the harmless error argument.  *Justice v. Rockwell Collins, Inc.*, 117 F.Supp.3d 1119, 1134 (D. Or. 2015), *aff'd*, 720 F. App'x 365 (9th Cir. 2017) ("if a party fails to counter an argument that the opposing party makes ... the court may treat that argument as conceded") (citation and internal quotations and brackets omitted); *Kinley v. Astrue*, No. 1:12-cv-740-JMS-DKL, 2013 WL 494122, at *3 (S.D. Ind. Feb. 8, 2013) ("The Commissioner does not respond to this [aspect of claimant's] argument, and it is unclear whether this is a tacit admission by the Commissioner that the ALJ erred or whether it was an oversight.  Either way, the Commissioner has waived any response.").

Even if the Commissioner had responded to Plaintiff's challenge on this basis, an ALJ cannot substitute his own lay opinion in place of medical testimony.  The ALJ failed to provide any authority or citations to the record in finding that Plaintiff's pain or tenderness on motion testing did not completely eliminate her ability to reach.  This falls far below the level of specificity required in this Circuit for the ALJ's weighing of medical opinions; that is, "[t]he ALJ must set out in the record his reasoning and the evidentiary support for his interpretation of the medical evidence."  *Tackett*, 180 F.3d at 1102 (internal citation omitted).

On this record, the ALJ's lay opinion that Plaintiff's pain and tenderness on range of motion did not completely eliminate her ability to reach was not a specific and legitimate reason to discount

Dr. Balytsky's opinion.  However, the ALJ's ultimate disability conclusion must be upheld, because he cited three other valid reasons for crediting Dr. Fisher's opinion over Dr. Balytsky's opinion, as discussed below.  *Stout*, 454 F.3d at 1056.

> b.   <u>Clinical findings from other treatment providers reveal Plaintiff was neurologically intact without diminished strength.</u>

A medical opinion may be rejected if it is unsupported by medical findings.  *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1228 (9th Cir. 2009); *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002); *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001).  An ALJ may also discredit physicians' opinions that are unsupported by the record as a whole.  *Batson*, 359 F.3d at 1195.  Moreover, an ALJ is not obliged to credit medical opinions that are unsupported by the medical source's own data and/or contradicted by the opinions of other examining medical sources.  *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008).

As Defendant convincingly points out, "[t]he findings and conclusions of Dr. Fischer [sic] and Dr. Balytsky are clearly in conflict, and the ALJ reasonabl[y] exercised his role as factfinder to credit Dr. Fischer's [sic] opinion as better supported by the record evidence."  ECF No. 17 at 4:27–5:1 (internal citations omitted).  In contrast, Plaintiff maintains that "Dr. Fisher did not measure [her] shoulder strength or consider the more recent MRI which confirmed anterior labrum tear of the left shoulder."  ECF No. 14 at 10:17–19; *see also* AR 694.  Plaintiff therefore insists that Dr. Balytsky's notes are more reliable than Dr. Fisher's notes, because Dr. Balytsky is the only physician who "had the opportunity to consider Broughton's deteriorated condition, evidenced by Broughton's most recent left shoulder MRI [revealing an anterior labrum tear], when rendering opinions."  ECF No. 19 at 4:9–11; *see also* AR 694.  To be more precise, "Dr. Balytsky examined Broughton eight times[] after Broughton underwent the most recent left shoulder MRI on record."  *Id*. at 4:12–14 (internal citations and footnote omitted).  Plaintiff also maintains that:

> [t]he Commissioner failed to address that the ALJ incorrectly referenced Broughton's 2014 left shoulder MRI as showing a shoulder tear. . . . The 2014 left shoulder MRI actually revealed no definite rotator cuff tear or tendinopathy. . . . The ALJ's mischaracterization of the evidence warrants remand because the error was harmful.  . . . The ALJ's mischaracterization of the 2014 MRI was harmful

because in affording Dr. Fisher great weight, the ALJ presumed Dr. Fisher examined Broughton and assessed functional limitations during the period that Broughton had a left shoulder tear.

ECF No. 19 at 4:22–5:8 (internal citations omitted).

Plaintiff seems to be—understandably—confused because the ALJ made what appears to be a clerical error in his findings.[14]  Specifically, the ALJ found that "[t]he claimant had an initial evaluation with a pain management doctor on *April 25, 2014.  At that evaluation*, the claimant had [a] . . . MRI . . . of [her] left shoulder revealing an anterior labral tear."  AR 22–23, *citing* AR 744–45 (emphasis added).  However, this MRI was taken in April 2015, not April 2014.  In contrast, the left shoulder MRI revealing "[n]o definite rotator cuff tear or tendinopathy" to which Plaintiff cites is dated May 15, 2014.  AR 701.  In other words, Plaintiff confuses these MRIs.  Although the ALJ erred in citing to a wrong examination date, the ALJ did not err in finding that the MRI taken at Plaintiff's initial evaluation revealed a tear in her left shoulder.

Plaintiff nonetheless argues that the ALJ committed reversible error, because he presumed Dr. Fisher examined her and assessed functional limitations knowing she had a left shoulder tear.  It is true that Dr. Fisher apparently never reviewed the April 2015 MRI revealing an anterior labrum tear in Plaintiff's left shoulder.  Notwithstanding, there is nothing in the findings to support a belief that the ALJ imputed knowledge of this MRI to Dr. Fisher.  As a matter of fact, in his June 6, 2015 Supplemental Orthopedic Panel Qualified Medical Evaluation Report, Dr. Fisher emphasized that he would like to review radiographic tests of Plaintiff's left shoulder.  AR 789.  Even though Dr. Fisher apparently did not review the April 2015 MRI, he did "review[] a nerve conduction study of Plaintiff's upper extremities [dated April 24, 2015], as well as an [undated] x-ray of the cervical spine, in June 2015. . . . Notably, [these] imaging stud[ies] returned significant results sufficient to change Dr. Fischer's [sic] opinion."  ECF No. 17 at 5:11–13 (internal citations omitted).  Indeed, after Dr. Fisher reviewed these nerve conduction studies, he amended his opinion to state that Plaintiff's bilateral upper extremities were "normal . . . without any evidence of peripheral neuropathy and no evidence of cervical radiculopathy," and that Plaintiff's cervical spine revealed "some anterior spurring at C5-6 and straightening of the normal cervical lordotic curve without any

---

[14]   Apart from the miscited year, the ALJ's findings on this basis are accurate in all respects.

evidence of significant disc space narrowing.  There is otherwise no evidence of fracture or dislocation seen with the only degenerative changes seen at the C5-6 anteriorly.  There is no evidence of subluxation, fracture, or dislocation . . . ." AR 789.  Dr. Fisher's findings are in accordance with other treatment notes in the record scoring Plaintiff's motor strength as five out of five "in the biceps, triceps, wrist flexors and extensors and intrinsics of the hand" (AR 419); finding Plaintiff's neurological system "[n]egative for weakness" (AR 797); and, assessing "normal" results on physical examination (AR 820).

In sum, other clinical findings in the record are contrary to Dr. Balytsky's opinion that Plaintiff was limited to less than full range of sedentary pushing and pulling.  Accordingly, the ALJ properly afforded little weight to Dr. Balytsky's opinion on the basis of its inconsistency with the record, because the ALJ is "the final arbiter with respect to resolving ambiguities in the medical evidence." *Tommasetti*, 533 F.3d at 1041.

> c. Dr. Balytsky and her staff assessed Plaintiff with the same restrictions over eighteen separate visits spanning more than one and a half years, despite other clinical findings showing changes in her condition.

Relevant factors to evaluating any medical opinion include the amount of relevant evidence that supports the opinion, the quality of the explanation provided in the opinion, and the consistency of the medical opinion with the record as a whole. *Lingenfelter v. Astrue*, 504 F.3d 1028, 1042 (9th Cir. 2007); *Orn*, 495 F.3d at 631.  Moreover, a physician's opinion may be rejected if it is unsupported by the physician's treatment notes. *Connett v. Barnhart*, 340 F.3d 871, 875 (9th Cir. 2003).

The ALJ gave Dr. Balytsky's opinion little weight because she or her staff assessed the same restrictions at every appointment from April 25, 2014 to August 26, 2015, despite clinical findings demonstrating variations in Plaintiff's condition.  AR 23.  In fact, as Plaintiff concedes, Dr. Balytsky or her staff assigned the same restrictions through November 3, 2015, not August 26, 2015.  ECF No. 14 at 12:19–21 (internal citations omitted); *see also* AR 615.  Defendant convincingly argues that "the ALJ rationally questioned Dr. Balytsky's seemingly duplicative findings in her treatment records, when the evidence indicated that Plaintiff's condition significantly improved over time." ECF No. 17 at 4:12–14.  For instance, when Dr. Fisher evaluated Plaintiff on August 15, 2014, he

opined that Plaintiff had not yet reached maximum medical improvement.  AR 363.  "However, by the reexamination on March [12,] 2015, Dr. Fischer [sic] concluded that Plaintiff had reached maximal medical improvement, and, despite giving 'very little effort,' she 'clinically appeared to be significantly stronger.'"  ECF No. 17 at 4:22–24 (internal citation omitted).  In contrast, no clinical improvement respecting restrictions was ever noted in Plaintiff's treatment notes in any of her visits to Dr. Balytsky's clinic.  AR 615, 618, 623, 625, 629, 632, 635, 638, 642, 646, 650, 651, 654, 658–59, 662–63, 665, 669, 672–73, 675, 679.

Plaintiff insists that her clinical observations and treatment respecting her alleged impairment were "not stale and represented [her] ongoing condition."  ECF No. 14 at 13:15–16.  For example, "[o]n March 2, 2015, treatment notes reflected [her] condition slightly worsened, documenting left shoulder abduction as 130 degrees and overall motor strength as 4-/5," and "documented a request for a cervical epidural steroid injection."  *Id*. at 10–12, 15–16 (internal citations omitted).  Further, "[o]n October 27, 2014, authorization for a left shoulder steroid injection was requested"; "[o]n April 1, 2015, treatment notes reported that Broughton took three Norco 10/325 a day without pain relief, and doctor[s] were considering increasing Norco to four times per day"; and, "[t]reatment[] notes dated November 3, 2015, show a left arm brace was requested to provide Broughton with support and pain relief."  *Id*. at 14:13–14, 16–20 (internal citations omitted).  A review of the record shows this to be true.  However, these deviations from otherwise static treatment notes do not answer why Dr. Balytsky and her staff assessed the same work restrictions over eighteen separate clinical visits.  As a matter of fact, it makes even less sense that Dr. Balytsky and her staff consistently assessed the same restrictions when they simultaneously adjusted Plaintiff's treatment regimen during this time.

Based on this record, the ALJ properly afforded little weight to Dr. Balytsky's opinion, because her clinic assessed Plaintiff with duplicative work restrictions notwithstanding treatment notes showing changes in her condition.  Given that the ALJ's finding is "supported by inferences reasonably drawn from the record, . . . and . . . evidence exists to support more than one rational interpretation, we must defer to the Commissioner's decision[.]"  *Batson*, 359 F.3d at 1193.

d.     The ALJ properly afforded more weight to Dr. Fisher's opinion because he specializes in orthopedics.

A medical provider's specialization is a relevant consideration in weighing medical opinion evidence.  20 C.F.R. §§ 404.1527(c)(5).  While the ALJ may give more weight to a specialist, it is error for the ALJ to reject a treating physician's opinion solely based on this reasoning.  *Sprague*, 812 F.2d at 1231 (recognizing that the treating physician was qualified to give a medical opinion as to the claimant's mental state despite not being a psychiatrist).

Here, the ALJ properly gave "more weight to the medical opinion of a specialist about medical issues related to his . . . area of specialty" pursuant to the Social Security regulations.  20 C.F.R. § 404.1527(c)(5).  To be more precise, the ALJ acknowledged that Dr. Fisher is an "orthopedist.  As such, his specialty is more closely related to[ the] claimant's diagnosed impairments than that of Dr. Balytsky."  AR 24 (internal citation omitted).  The ALJ, however, makes no mention of Dr. Balytsky's specialization.  Plaintiff therefore contends that the ALJ's reasoning is insufficient to find "that an orthopedist is more qualified than an interventional pain medicine specialist [such as Dr. Balytsky] in treating and assessing appropriate limitations for an individual like [her]."  ECF No. 14 at 17:6–8.

The Regulations do not require the ALJ to make specific findings weighing the relative qualifications of competing physicians in evaluating claims but, rather, state that the Commissioner will "generally give more weight to the medical opinion of a specialist about medical issues related to his or her area of specialty than to the medical opinion of a source who is not a specialist."  20 C.F.R. § 404.1527(c)(5).  An "orthopedist," including Dr. Fisher, is "a doctor who specializes in the branch of medicine concerned with the correction or prevention of deformities, disorders, or injuries of the skeleton and associated structures."  ORTHOPEDIST, *Merriam-Webster*, *available at* https://www.merriam-webster.com/dictionary/orthopedist (last visited Feb. 28, 2020).  On the other hand, Dr. Balytsky is an "[a]nethesiologist who specializes in Pain Medicine [and] provides care for patients with acute, chronic and/or cancer pain in both inpatient and outpatient settings while coordinating patient care needs with other specialists."  ECF No. 14 at 16:23–17:2 (internal citations and quotation marks omitted) (emphasis added).  Put simply, Plaintiff's shoulder impairment is an

orthopedic concern and, therefore, is related to Dr. Fisher's medical specialization.  *Cf. Sullivan v. Berryhill*, 317 F.Supp.3d 658, 664 (D. Mass. 2018) (finding substantial evidence supported the ALJ's decision to rely on the examining physician's opinion discussing claimant's shoulder limitations instead of the treating physician's opinion, in part because the treating physician was not an orthopedic specialist).  Further, the ALJ did not afford limited weight to Dr. Balytsky's opinion solely because Dr. Fisher is an orthopedist but, rather, she cited two other specific and legitimate reasons for doing so:  Dr. Fisher's findings revealed Plaintiff was neurologically intact without diminished strength, and Dr. Balytsky and her staff generally assessed the same restrictions at every clinical visit notwithstanding changes in Plaintiff's condition.  On this record, the ALJ properly afforded greater weight to Dr. Fisher's opinion on the basis of his specialization.

## IV.    CONCLUSION

The ALJ improperly opined that Plaintiff's range of motion did not completely preclude her ability to reach.  However, this mistake was nonprejudicial to the ALJ's ultimate disability conclusion as the ALJ properly found, using the specific and legitimate standard, that Plaintiff's treating physician's opinion should be afforded limited weight in favor of Dr. Fisher's opinion, because other clinical findings revealed Plaintiff was neurologically intact without diminished strength, Dr. Balytsky and her staff assessed the same restrictions despite documented changes in Plaintiff's condition, and Plaintiff's shoulder impairment is relevant to Dr. Fisher's orthopedic specialization.

## V.    RECOMMENDATION

IT IS HEREBY RECOMMENDED that Plaintiff's Motion for Reversal and/or Remand (ECF No. 14) be DENIED, and Defendant's Cross Motion to Affirm and Opposition to Plaintiff's Motion to Remand (ECF No. 17) be GRANTED.

DATED this 3rd day of March, 2020.

ELAYNA J. YOUCHAH
UNITED STATES MAGISTRATE JUDGE

**NOTICE**

Pursuant to Local Rule IB 3-2, any objection to this Finding and Recommendation must be in writing and filed with the Clerk of the Court within fourteen (14) days. The Supreme Court has held that the courts of appeal may determine that an appeal has been waived due to the failure to file objections within the specified time. *Thomas v. Arn*, 474 U.S. 140, 142 (1985). This circuit has also held that (1) failure to file objections within the specified time and (2) failure to properly address and brief the objectionable issues waives the right to appeal the District Court's order and/or appeal factual issues from the order of the District Court. *Martinez v. Ylst,* 951 F.2d 1153, 1157 (9th Cir. 1991); *Britt v. Simi Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).